**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

YALTA ALVARADO-GOLDEN, ERIKA NASH, ZHANA KRISTOFF, and VERONICA PATILLO, individually and on behalf of all similarly situated persons,

Plaintiffs,

v.

DELAWARE NORTH COMPANIES SPORTSERVICE, INC., MANAGEMENT SERVICES, INC., and DETROIT SPORTSERVICE, INC.,

Defendants.

Case No. 2:26-cv-
Hon.

Removed from the Circuit Court for the County of Wayne (Third Judicial Circuit), Business Court, Case No. 26-017893-CB, Hon. Kathleen M. McCarthy

---

BLANCHARD & WALKER PLLC
David M. Blanchard (P67190)
Cali N. Winslow (P88487)
Attorneys for Plaintiffs
221 N. Main Street, Suite 300
Ann Arbor, Michigan 48104
(734) 929-4313
blanchard@bwlawonline.com
winslow@bwlawonline.com

JACKSON LEWIS P.C.
Allan S. Rubin (P44420)
Amira Genevieve Adel (P85646)
Attorneys for Defendants
2000 Town Center, Suite 1650
Southfield, Michigan 48075
(248) 936-1900
allan.rubin@jacksonlewis.com
amiragenevieve.adel@jacksonlewis.com

---

**DEFENDANT DETROIT SPORTSERVICE, INC.'S**
**NOTICE OF REMOVAL**

**TO:** The Clerk of the United States District Court for the Eastern District of Michigan; Plaintiffs and their counsel of record; and the Clerk of the Circuit Court for the County of Wayne (Third Judicial Circuit).

PLEASE TAKE NOTICE that Defendant Detroit Sportservice, Inc. ("Detroit Sportservice"), with the written consent of Defendants Delaware North Companies Sportservice, Inc. ("DNC Sportservice") and Management Services, Inc. ("Management Services") (collectively, "Defendants"), removes the above-captioned action from the Circuit Court for the County of Wayne (Third Judicial Circuit), Business Court, to the United States District Court for the Eastern District of Michigan, Southern Division. Removal is based on 28 U.S.C. §§ 1331, 1367(a), 1441(a), and 1446 and Section 301 of the Labor Management Relations Act ("LMRA" or "§ 301"), 29 U.S.C. § 185(a). This Notice contains "a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014). In support, Defendants state as follows:

## I. THE STATE COURT ACTION

1. On October 9, 2026, Plaintiffs Yalta Alvarado-Golden, Erika Nash, Zhana Kristoff, and Veronica Patillo ("Plaintiffs") filed a Class Action Complaint and Jury Demand (the "Complaint") in the Circuit Court for the County of Wayne (Third Judicial Circuit), captioned *Alvarado-Golden, et al. v. Delaware North Companies Sportservice, Inc., et al.*, Case No. 26-017893-CB (the "State Court Action"). Plaintiffs designated the case for the Business Court under Mich. Ct. R.

2.112(O) and Mich. Comp. Laws § 600.8031 *et seq.* The case was assigned to the Honorable Kathleen M. McCarthy.

2. Plaintiffs allege that they are suite servers who work the private suites at Comerica Park, the home of the Detroit Tigers, and that Defendants operate the food and beverage service in those suites. (Compl. ¶¶ 1–2.) Plaintiffs allege tenure as suite servers since approximately 2003 (Patillo), March 2005 (Alvarado-Golden), 2013 (Kristoff), and April 2019 (Nash). (*Id.* ¶¶ 14, 16, 17, 19.) Each Plaintiff alleges Michigan residence — Flat Rock, Houghton Lake, Allen Park, and Harper Woods. (*Id.* ¶¶ 13, 15, 18, 20.)

3. Plaintiffs allege that Defendants paid suite servers an hourly cash wage of $7.20 in 2024, $7.40 in 2025, and $7.60 in 2026, took a tip credit against the Michigan minimum wage, and required suite servers to give "a fixed share of their gratuities, generally forty percent, to the food runners." (*Id.* ¶¶ 33, 37.)

4. Plaintiffs allege the arrangement was "Defendants' policy," imposed as "a condition of working the suites" (*id.* ¶¶ 39–41), and that Defendants "treated the Tip Pool as a longstanding, grandfathered practice" (*id.* ¶ 42). Plaintiffs challenge a 2025 "Tip Pool Notification" describing a "mandatory tip pool" in which servers "contribute 100% of the tips" (*id.* ¶¶ 44–49 & Ex. 1); a 2026 "Tip Sharing Program" providing that "Servers will receive 60% of the Tips" and that "[t]he remaining 40% of the Tips are pooled and distributed to the Food Runners" (*id.* ¶ 51 & Ex. 2); and

a revised 2026 form stated to be irrevocable until July 13 (*id.* ¶¶ 62–64 & Ex. 3). Plaintiffs allege that suite servers were told they could not bid on suites until they signed. (*Id.* ¶¶ 55–58.) Yet Plaintiffs' own exhibits state that the 2026 Tip Sharing Program and the Revised Tip Sharing Program were developed in coordination with "your union," and the revised form directs questions to "Human Resources or Unite HERE/Local 24." (*Id.*, Exs. 2, 3.)

5. The Complaint asserts five counts: (I) failure to pay the minimum wage under the Improved Workforce Opportunity Wage Act ("IWOWA"), Mich. Comp. Laws § 408.934d(1)(d)–(e) (Compl. ¶¶ 78 (second)–88); (II) "tip stealing" under Mich. Comp. Laws §§ 408.934d(4), 408.939 (*id.* ¶¶ 89–96); (III) statutory conversion under Mich. Comp. Laws § 600.2919a (*id.* ¶¶ 97–105); (IV) unjust enrichment, pleaded in the alternative (*id.*, Count IV ¶¶ 103–108); and (V) quantum meruit, pleaded in the alternative (*id.* ¶¶ 111–117).[1]

6. Plaintiffs seek to represent a class of "[a]ll persons employed by Defendants as suite servers at Comerica Park at any time from six years before the filing of this Complaint through the date of judgment," and reserve the right to add "other tipped classifications subject to the same practices." (Compl. ¶¶ 69–70.) Plaintiffs seek unpaid minimum wages, the value of all gratuities allegedly taken,

[1] The Complaint contains duplicated paragraph numbers (24–28, 78, and 103–105) and omits 36, 43, 68, 109, and 110. They are referred to as "first" and "second" referencing whether they are the first or second time used in the Complaint.

equal liquidated damages, actual and treble damages for statutory conversion, interest, attorney fees, and costs, jointly and severally. (*Id.*, Relief Requested ¶¶ A–H.) Under Mich. Ct. R. 3.501(A)(5), the class seeks actual damages only, with the named Plaintiffs seeking liquidated and treble damages individually. (*Id.* ¶ 78 (first).)

7. Plaintiffs allege that their rights "exist independently of any collective bargaining agreement, do not depend on interpreting one, and could not be waived by one." (*Id.* ¶ 12.) That allegation is a legal conclusion and does not control whether Plaintiffs' claims are founded on, or substantially dependent on interpretation of, a collective bargaining agreement. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985); *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033, 1037–38 (6th Cir. 1989).

8. On October 28, 2026, Judge McCarthy entered a Status Conference Scheduling Order in the State Court Action. That order is an "order" within the meaning of 28 U.S.C. § 1446(a) and is included in **Exhibit A** with all other process, pleadings, and orders.

9. Detroit Sportservice was served with the Summons and Complaint on October 19, 2026, by certified mail. DNC Sportservice was served with the Summons and Complaint on October 19, 2026, by certified mail, return receipt requested, addressed to its registered agent, Cogency Global, Inc., 186 N. Main

Street, Floor 2, Suite 1, Plymouth, Michigan 48170. Management Services was served with the Summons and Complaint on October 19, 2026, by certified mail, return receipt requested.

10. No Defendant has answered or otherwise responded to the Complaint in the State Court Action.

**REMOVAL IS TIMELY**

11. This Notice is timely under 28 U.S.C. § 1446(b)(1) and (b)(2)(B). Detroit Sportservice and DNC Sportservice were each served with the Summons and Complaint by certified mail on October 19, 2026, and Management Services was served on October 19, 2026. The thirtieth day after October 19, 2026 is November 18, 2026, a Wednesday. *See* Fed. R. Civ. P. 6(a)(1). This Notice is filed within thirty days after service on the first-served Defendants. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999) (removal period runs from formal service of process). Each Defendant joins in or consents to this removal within its own thirty-day period. 28 U.S.C. § 1446(b)(2)(B)–(C); *Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527, 533 & n.3 (6th Cir. 1999).

## II. THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFFS' CLAIMS ARE COMPLETELY PREEMPTED BY SECTION 301 OF THE LMRA

### A. *Governing Standard*

12. A defendant may remove any civil action of which the district courts have original jurisdiction. 28 U.S.C. § 1441(a).

13. The district courts have original jurisdiction of all civil actions arising under the laws of the United States, 28 U.S.C. § 1331, including "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a).

14. Section 301's preemptive force is "so powerful as to displace entirely any state cause of action" founded on rights created by a collective bargaining agreement or substantially dependent on analysis of such an agreement. *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 23 (1983). Such a claim "is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 7–8 (2003) (a completely preempted claim is removable notwithstanding the plaintiff's state-law labels). Section 301 reaches claims sounding in tort and quasi-contract whose resolution is "inextricably intertwined with consideration of the terms of the labor contract." *Allis-Chalmers*, 471 U.S. at 213, 220. Preemption does not reach a claim that can be resolved without interpreting the agreement. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–07, 413 & n.12 (1988); *Livadas v. Bradshaw*, 512 U.S. 107, 123–25 (1994).

15. The Sixth Circuit applies a two-step inquiry. First, the court asks whether proof of the state-law claim requires interpretation of the collective bargaining agreement's terms. Second, the court asks whether the right claimed by the plaintiff is created by the collective bargaining agreement or instead by state law. "If the right claimed arises from the CBA, or if proof of the state law claim requires interpretation of CBA terms, the claim is preempted." *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994); *Mattis v. Massman*, 355 F.3d 902, 906 (6th Cir. 2004) (a claim failing *either* step is preempted). The Sixth Circuit recently reaffirmed the *DeCoe* framework and described § 301's preemptive force as "far reaching." *Baltrusaitis v. UAW*, 133 F.4th 678 (6th Cir. 2025); *see also Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Local 150*, 3 F.4th 866, 873 (6th Cir. 2021).

16. Section 301's preemptive force is "so powerful as to displace entirely any state cause of action" founded on rights created by a collective bargaining agreement or substantially dependent on analysis of such an agreement. *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 23 (1983). Such a claim "is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 7–8 (2003) (a completely preempted claim is removable notwithstanding the plaintiff's state-law labels); *Baltrusaitis v. UAW*, 133

F.4th 678, 685 (6th Cir. 2025) (§ 301's preemptive force is "unusually 'powerful,'" "authorizing removal of actions that sought relief only under state law" (quoting *Beneficial Nat'l Bank*, 539 U.S. at 6–7)). Section 301 reaches claims sounding in tort and quasi-contract whose resolution is "inextricably intertwined with consideration of the terms of the labor contract." *Allis-Chalmers*, 471 U.S. at 213, 220; *see Baltrusaitis*, 133 F.4th at 685 (§ 301's preemptive force is "far reaching, 'extend[ing] beyond suits alleging contract violations'" (quoting *Allis-Chalmers*, 471 U.S. at 210)). Preemption does not reach a claim that can be resolved without interpreting the agreement. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–07, 413 & n.12 (1988); *Livadas v. Bradshaw*, 512 U.S. 107, 123–25 (1994).

17. The Sixth Circuit applies a two-step inquiry. First, the court asks whether proof of the state-law claim requires interpretation of the collective bargaining agreement's terms. Second, the court asks whether the right claimed by the plaintiff is created by the collective bargaining agreement or instead by state law. "If the right claimed arises from the CBA, or if proof of the state law claim requires interpretation of CBA terms, the claim is preempted." *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994); *Mattis v. Massman*, 355 F.3d 902, 906 (6th Cir. 2004) ("In short, if a state-law claim fails *either* of these two requirements, it is preempted by § 301."). The Sixth Circuit recently reaffirmed the *DeCoe* framework and described § 301's preemptive force as "far reaching." *Baltrusaitis*, 133 F.4th at

685 ("If Plaintiffs' claims require interpretation of the terms of the collective bargaining agreement or if the rights claimed by Plaintiffs are created by the collective bargaining agreement, then their claims are completely preempted . . . ."); *see also Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Local 150*, 3 F.4th 866, 873 (6th Cir. 2021).

18. Three features control. *First*, the court looks past the plaintiff's labels to "the essence of the plaintiff's claim, in order to determine whether the plaintiff is attempting to disguise what is essentially a contract claim as a tort," and the well-pleaded complaint rule does not shield an artfully pleaded state-law claim from Section 301. *DeCoe*, 32 F.3d at 216–18; *Baltrusaitis*, 133 F.4th at 685 (parties may not "evade the requirements of § 301 by relabeling their contract claims" (quoting *Allis-Chalmers*, 471 U.S. at 211)); *Terwilliger*, 882 F.2d at 1038 (preemption applies where the collective bargaining agreement "provides the only basis for the relationship" between the parties). *Second*, preemption is not limited to "cases where the precise meaning of precise words in the CBA is the crux of the state-based claim"; it applies where resolving the claim requires the court to examine "the practices and customs of a workplace whose conditions are governed by a CBA." *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 383 (6th Cir. 1991). *Third*, preemption has limits: "neither a tangential relationship to the CBA, nor the defendant's assertion of the contract as an affirmative defense will turn an otherwise independent

claim into a claim dependent on the labor contract." *DeCoe*, 32 F.3d at 216; *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1329–30 (6th Cir. 1989) (*en banc*). Removal here does not rest on such a defense. As shown below, the CBA must be interpreted to resolve elements of Plaintiffs' own claims, including whether the funds at issue were Plaintiffs' property and whether an express contract governs their allocation.

B. ***The Collective Bargaining Agreement***

19. Defendants do not invoke the CBA merely as a defense. *Cf. Caterpillar*, 482 U.S. at 398–99; *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 799–800 (6th Cir. 1990) ("[A] defendant's reliance on a CBA term purely as a defense to a state law claim does not result in section 301 preemption."). Defendants recognize that § 301 does not permit an employer and a union to agree to conduct that state law independently forbids, and that merely consulting a collective bargaining agreement does not require preemption. *Allis-Chalmers*, 471 U.S. at 212; *Livadas*, 512 U.S. at 124 ("[T]he bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."). Rather, Plaintiffs' claims cannot be adjudicated without interpreting the express and implied terms of the CBA that governs suite-server and suite-runner compensation at Comerica Park. Plaintiffs plead (1) the absence of a governing express contract as an element of Count IV; (2) that the gratuities were "received by" the servers and

were their "personal property"; and (3) that the allocation was non-consensual and "imposed." Each of those allegations requires interpretation and application of the CBA.

20. At all relevant times, suite servers and suite food runners at Comerica Park have been represented by UNITE HERE Local 24 ("Local 24" or the "Union"), a labor organization representing employees in an industry affecting commerce within the meaning of 29 U.S.C. §§ 152(5) and 185(a). (Declaration of Doug Gardner ("Gardner Decl.") ¶¶ 3, 11, attached as **Exhibit B**.)

21. The operative agreement is the Collective Bargaining Agreement Between Sportservice Comerica Park and UNITE HERE! Local 24, effective March 1, 2023 through March 31, 2027 (the "CBA"). (CBA, Art. 1 § 1, Art. 21 § 1; Gardner Decl. ¶ 8 & Ex. B-1.)

22. The CBA recites that it was "made and entered into this 1st day of March 2011, between UNITE HERE! Local 24 . . . and Sportservice Comerica Park," and it bears signature dates of March 21, 2024 and April 23, 2024. (CBA, Art. 1 § 1.)

23. "Sportservice Comerica Park" is the name used for Detroit Sportservice in the CBA. Detroit Sportservice operates the food and beverage concession at Comerica Park and is the employer signatory to the CBA. (Gardner Decl. ¶¶ 3–4, 9.)

24. The CBA covers, among other classifications, "Suite Servers" and "Suite Food Runner[s]," and fixes their hourly rates in Schedule A: Suite Servers at $7.00 (July 1, 2023), $7.20 (March 1, 2024), $7.40 (March 1, 2025), and $7.60 (March 1, 2026); Suite Food Runners at $7.80, $8.00, $8.20, and $8.40 over the same dates. Non-tipped Stand Workers, by contrast, are paid $14.50 to $15.85. (CBA, Schedule A.) Each named Plaintiff has been a member of the bargaining unit covered by the CBA and its predecessor agreements throughout the employment alleged in the Complaint. (Gardner Decl. ¶ 12.)

C. ***The 60/40 Additional-Tip Allocation Has Been an Established Practice Since at Least 2002, Known to the Union, and Is an Implied Term of the CBA***

25. Since at least 2002, additional tips left by suite holders on suite bills in the Comerica Park suites, other than the Owner block, beyond the 18 percent service charge, have been allocated sixty percent to the suite server assigned to the suite and forty percent to the suite food runners who deliver food to the suites (the "60/40 Allocation"). Beverage runners do not share in the runners' forty-percent share, which is pooled among the suite food runners and paid through payroll. The service charge itself is separately allocated 10 percent to suite servers, 5 percent to suite food and beverage runners, and 3 percent to Detroit Sportservice. (Gardner Decl. ¶¶ 7, 13.)

26. Detroit Sportservice and Local 24 have negotiated successor agreements on multiple occasions, including the current CBA. (Gardner Decl. ¶¶ 3, 10.) Those agreements, including the Schedule A suite-server and suite-runner hourly rates and minimum gratuities, were negotiated while the 60/40 Allocation was in place and known to Local 24. (*Id.* ¶¶ 7, 13(b).) Local 24 has not sought to bargain over the allocation of additional tips since 2002, and the 60/40 Allocation continued unchanged until 2026, when Detroit Sportservice and Local 24 bargained over it. (*Id.* ¶¶ 13(b), 18, 22.)

27. The bargained suite compensation architecture itself reflects the 60/40 Allocation and cannot be read coherently without it:

> (a) Schedule A entitles suite servers to "a minimum gratuity of 10% of the total bill to the suite holder," and states that "the minimum gratuity paid results in the server achieving the Federal Minimum Wage."
>
> (b) Schedule A entitles suite food runners to "a minimum gratuity of 5% of the total bill to the suite holder that will be pooled among the Suite food runners group each week." In practice that 5 percent is paid from the separate 18 percent service charge, not from additional tips. (Gardner Decl. ¶¶ 13(a), 15.) Schedule A also sets runner hourly rates below the non-tipped Stand Worker rates, consistent with the parties' understanding that runners would also receive the 40 percent share of additional tips under the 60/40 Allocation.
>
> (c) Side Letter 3 provides that suite servers who bid successfully on the Owner block "shall maintain the gratuity and wage rate that is currently in place as of the ending of the 2007 season," and that "[t]his will not be split with the Runners." A negotiated carve-out from a split necessarily presupposes a split everywhere else. The parties would have

had no reason to exempt the Owner block from a division of gratuities that did not exist.

28. From at least 2002 through the 2025 season, the 60/40 Allocation was applied each season to suite servers and suite food runners in the bargaining unit, and Local 24 has long known of it as a long-standing practice regularly discussed among Union members, including at meetings. (Gardner Decl. ¶¶ 7, 13(b), 17.) Plaintiffs themselves plead the practice's longevity and uniformity: they allege it applied "[t]hroughout the class period," that the share was "generally forty percent," and that Defendants treated it "as a longstanding, grandfathered practice." (Compl. ¶¶ 37, 42.) Plaintiffs' own allegations describe the kind of settled shop practice that federal labor law may treat as part of the agreement.

29. After the tip-sharing rules for suite food runners changed in 2026, the Union filed grievances concerning the tip split, which remain pending in the Article 5 grievance process; the most recent was filed on August 6, 2026. (Gardner Decl. ¶ 20.)

30. The 2025 Tip Pool Notification did not change the 60/40 Allocation. In 2026, Detroit Sportservice bargained with Local 24 over the allocation and changed it so that each suite server decides the amount to contribute to the suite food and beverage runners; that arrangement ran through the All-Star break, after which a revised form was executed. The 2026 form used was approved by the president of

Local 24. (Gardner Decl. ¶¶ 21–22.) Defendants do not contend that the allocation operated identically throughout 2026.

31. Because the 60/40 Allocation is an established practice known to Local 24 across successive agreements, Defendants contend that it is an implied term of the CBA; whether it is, and what it requires, are questions of federal contract interpretation. *See Warrior & Gulf*, 363 U.S. at 581–82; *Allis-Chalmers*, 471 U.S. at 215. Defendants do not rely on these principles alone to establish complete preemption; removal rests on the element-specific showing in Part II.E below.

### D. *CBA Provisions Whose Interpretation Is Required, and Provisions Merely Referenced*

32. Adjudicating Plaintiffs' claims requires interpreting the following CBA provisions, together with the 60/40 Allocation:

| CBA provision | Relevant text | Interpretive question | Counts |
|---|---|---|---|
| Schedule A, "Suite Servers" (minimum gratuity) | "Suite servers shall receive in addition to the above hourly rate a minimum gratuity of 10% of the total bill to the suite holder. It is understood that the minimum gratuity paid results in the server achieving the Federal Minimum Wage." | Whether the bargained "minimum gratuity" is a contractual compensation term distinct from guest add-on tips, and whether suite gratuities are a collectively bargained compensation stream subject to the 60/40 Allocation rather than amounts "received" by the server. | II, III, IV, V |
| Schedule A, "Suite food runners" | "Suite food runners shall receive in addition to the above hourly rate | Whether the runners' 40% share of additional tips, which is distinct from the 5% | II, III, IV, V |

| CBA provision | Relevant text | Interpretive question | Counts |
|---|---|---|---|
| (runner gratuity pool) | a minimum gratuity of 5% of the total bill to the suite holder that will be pooled among the Suite food runners group each week." | minimum gratuity paid from the service charge, is part of the bargained runner compensation reflected in Schedule A's runner rates; and whether runner payments are bargained compensation rather than a diversion of server property. | |
| Side Letter 3 (Owner block) | "All Suite Servers that bid successfully on the Owner block of suites shall maintain the gratuity and wage rate that is currently in place as of the ending of the 2007 season. This will not be split with the Runners." | Whether the no-split carve-out presupposes and confirms a bargained split with runners in all other suite blocks, and the scope of the "gratuity and wage rate" the parties froze. | II, III, IV, V |
| Article 7, Section 6 (advantages heretofore enjoyed; no wage reduction) | "No employee shall at anytime be deprived of any advantage or privilege heretofore enjoyed . . . . There shall in no event and at no time be a reduction in wages to any employees covered by this Agreement, except by mutual written agreement between Sportservice and the Union." | Whether the runners' established 40% share is an "advantage or privilege heretofore enjoyed" that Sportservice could not lawfully eliminate unilaterally — which directly rebuts the allegations that the pool was "Defendants' policy" that Defendants "imposed" (Compl. ¶¶ 39–41), and bears on voluntariness, consent, "own use," and whether any enrichment was "unjust." | II, III, IV, V |
| Side Letter 2 (Labor-Management | "All changes to any work rules and policies shall be submitted to | Whether the 2025 and 2026 forms were "changes to . . . work rules and policies" | II, III, IV, V |

| CBA provision | Relevant text | Interpretive question | Counts |
|---|---|---|---|
| Committee); Schedule A, "Suite Servers (Party Suites)" | the Union before implementation by Sportservice." Party-suite issues are to be discussed "in the Labor-Management meetings." | requiring submission to the Union, or instead documentation of an existing bargained term, and the effect of Union review on Plaintiffs' consent and voluntariness theories. | |
| Schedule A (suite bidding); Article 3, Section 4 (seniority) | "Suite servers shall choose their suites to work by seniority. Each suite server shall bid upon his/her suites at the beginning of each season. . . . In the event of layoffs, the Employer will re-bid the blocks." Article 3 § 4: "work schedules shall be made in accordance with seniority." | Whether, and on what conditions, bid rights could be exercised — a question Plaintiffs themselves place at issue by alleging that servers could not bid until the 2026 forms were signed (Compl. ¶¶ 55–58) and that gratuities were surrendered as "a non-negotiable condition of working in the suites" (Compl., Count IV ¶ 105). | II, III, IV, V |
| Article 4, Sections 2 and 4 (management rights) | "[T]he method of paying compensation . . . is vested exclusively with Sportservice," and Sportservice "retains . . . all of its rights and functions of management which are not inconsistent with this Agreement." | Whether paying the runners' share through payroll is an exercise of the reserved right to determine "the method of paying compensation," which bears on the allegation that Defendants exercised dominion over gratuities and converted them to their "own use." | III, IV, V |
| Implied term: the 60/40 Allocation (past practice) | Continuously applied, with Local 24's knowledge, from at least 2002 through the | Whether the 60/40 Allocation is a term of the CBA and what it requires — the threshold question for whether any "express contract" governs | II, III, IV, V |

| CBA provision | Relevant text | Interpretive question | Counts |
|---|---|---|---|
| | 2025 season (Part II.C above). | the transfer of gratuities (Compl., Count IV ¶ 106) and whether the runners' share was ever the servers' property. | |

E. ***Claim-by-Claim Preemption Allegations***

**1. Count IV (Unjust Enrichment)**

33. Count IV is founded on, and substantially dependent on interpretation of, the CBA. Under Michigan law, "a contract will be implied only if there is no express contract covering the same subject matter." *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 194, 729 N.W.2d 898 (2006) (quoting *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 478, 666 N.W.2d 271 (2003)). Plaintiffs plead, as an element of Count IV, that "[n]o express contract between Plaintiffs and Defendants lawfully governs the transfer of Plaintiffs' gratuities to Defendants or to Defendants' other employees." (Compl., Count IV ¶ 106.) That allegation cannot be adjudicated without deciding whether the CBA — including the Schedule A gratuity provisions, Side Letter 3, Article 7, Section 6, and the 60/40 Allocation as an implied term — governs the transfer of suite gratuities to the runners. That is a question of federal contract interpretation. *Allis-Chalmers*, 471 U.S. at 215. This analysis applies most directly to Detroit Sportservice, the employer signatory to the CBA. But Plaintiffs plead Count IV jointly against all Defendants

based on the same allocation of the same gratuities, and deciding whether any benefit conferred on any Defendant was unjust still requires determining whether the CBA governed that allocation.

34. Count IV also requires examination of the workplace practices and customs governed by the CBA. *Jones*, 939 F.2d at 383. In *Heard v. SBC Ameritech Corp.*, 205 F. App'x 355, 358 (6th Cir. 2006), the Sixth Circuit held preempted a promissory-estoppel claim based on the employer's leave policy where leave was governed by the CBA, explaining that the employee could not "make an end run around federal labor law simply by asserting that the collective bargaining agreement does not spell out the precise details" of the policy. Plaintiffs' theory is the same: adjudicating it requires the Court to determine what the parties agreed to under the CBA and whether the alleged practices supplement, implement, or conflict with that agreement.

35. Count IV's remaining elements independently require interpretation. Plaintiffs must prove that the benefit was not conferred "voluntarily" but as "a non-negotiable condition of working in the suites" (Compl., Count IV ¶ 105), and that Defendants' retention was "inequitable" (*id.* ¶ 107). Whether the allocation was voluntary turns on whether it was a term of employment bargained by Plaintiffs' exclusive representative; whether conditioning the suite bid on pre-season paperwork was consistent with the Schedule A bidding and Article 3, Section 4

seniority provisions; and whether Article 7, Section 6 *barred* Sportservice from unilaterally eliminating the runners' long-standing share. Whether retention was "inequitable" turns on whether Defendants retained anything at all or instead paid the runners' bargained share through payroll as the "method of paying compensation" reserved to management by Article 4, Section 2. Each question is one of federal labor-contract interpretation. *DeCoe*, 32 F.3d at 216–18; *Mattis*, 355 F.3d at 906. Here, the CBA questions arise from elements Plaintiffs themselves must prove. Thus, Count IV is completely preempted and arises under 29 U.S.C. § 185(a).

### 2. Count V (Quantum Meruit)

36. Count V seeks the "reasonable value" of Plaintiffs' suite-server services, measured by the gratuities allocated to the runners. (Compl. ¶¶ 111–117.) Quantum meruit implies a promise to pay for services where the parties have *not* agreed on compensation. Here they have. The CBA fixes the entire compensation package for suite-server work: the Schedule A hourly rate; the 10% minimum gratuity; suite bidding by seniority; the $50 guest-brought-food payment and the $200 corporate-suite-event payment; the Owner-block rule in Side Letter 3; and the 60/40 Allocation as an implied term. The Court cannot determine whether any additional compensation may be implied for those same services, or what their "reasonable value" is, without first determining what the CBA provides, to whom, and with what effect. *Heard*, 205 F. App'x at 357–58; *Terwilliger*, 882 F.2d at 1037–

38 (the labor agreement "provides the only basis for the relationship"). Count V is completely preempted and arises under 29 U.S.C. § 185(a).

### 3. Count III (Statutory Conversion, Mich. Comp. Laws § 600.2919a)

37. Count III alleges that the gratuities allocated to the runners were the suite servers' "personal property," that Defendants had an "obligation to deliver" those specific gratuities to the servers, that Defendants obtained them "without the suite servers' consent," and that Defendants converted them to their "own use" by using them "to pay compensation for other workers and thereby reduc[ing] Defendants' own labor costs." (Compl. ¶¶ 100, 102.)

38. Every element of this claim turns on the CBA. Whether the runners' 40% share was ever the servers' property — as opposed to bargained runner compensation under the Schedule A runner pool, Side Letter 3, and/or the 60/40 Allocation — requires interpretation of the gratuity architecture. Whether Defendants had an "obligation to deliver" that share to the servers requires interpretation of the same provisions and of Article 7, Section 6. Whether the allocation occurred "without . . . consent" requires determining whether it was an agreed term negotiated by the servers' exclusive representative and, if so, its scope and effect — questions that depend on the existence and meaning of the asserted CBA term. Whether Defendants used the funds for their "own use" requires determining whether payment through payroll to other bargaining-unit employees

was the bargained "method of paying compensation" reserved by Article 4, Section 2.

39. That a state statute supplies the label does not by itself change the analysis. Courts have held state statutory claims preempted where resolving them depends on analysis of the CBA. *See Paluda v. ThyssenKrupp Budd Co.*, 303 F. App'x 305, 308–09 (6th Cir. 2008) (Elliott-Larsen Civil Rights Act claims completely preempted because they were substantially dependent on analysis of the collective bargaining agreement); *Robinson v. V&S Detroit Galvanizing, LLC*, 195 F. Supp. 3d 916, 921–23 (E.D. Mich. 2016) (Michigan claim for breach of wage and fringe benefits preempted by § 301).

40. Count III's statutory-conversion label does not defeat federal jurisdiction. Removal rests not on ordinary defensive preemption, but on § 301's complete-preemption doctrine, under which a state-law claim is treated from its inception as a federal claim when the asserted right is created by a collective bargaining agreement or resolving the claim requires interpretation of that agreement. *Gaines v. Blue Cross Blue Shield of Mich.*, 261 F. Supp. 2d 900, 902 (E.D. Mich. 2003). Plaintiffs cannot establish two essential elements — that the runners' share was the servers' property and that Defendants were obligated to deliver it to them — without determining whether the 60/40 Allocation is an implied term of the CBA and how it interacts with the Schedule A gratuity provisions and

Side Letter 3. Those questions must be resolved to establish liability, not merely to evaluate a defense. Count III is therefore completely preempted by § 301 and removable as a federal claim. 28 U.S.C. § 1441(a). In the alternative, Count III is within this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

#### 4. Count II (IWOWA "Tip Stealing," Mich. Comp. Laws §§ 408.934d(4), 408.939)

41. Count II alleges that the gratuities were "received by the suite servers within the meaning of MCL 408.934d(3)" (Compl. ¶ 91) and that Defendants took a fixed share of them "to meet Defendants' business needs" (*id.* ¶ 93). Count II does not challenge a *rate*. It challenges the *allocation* of a bargained compensation stream between two classifications in the same bargaining unit. Defendants recognize that Mich. Comp. Laws § 408.934d addresses employee retention and ownership of gratuities, and that the CBA cannot waive a right that the statute independently confers. *Allis-Chalmers*, 471 U.S. at 212; *Livadas*, 512 U.S. at 123–25. The question here is different: whether the runners' share was a gratuity "received by" the servers at all, or was instead runner compensation under the CBA's gratuity provisions, Side Letter 3, and the 60/40 Allocation; and whether the allocation served "Defendants' business needs" or instead implemented a bargained term that Article 7, Section 6 barred Defendants from changing unilaterally without the Union's written agreement. Both questions require interpretation of the CBA. *Robinson*, 195 F. Supp. 3d at 921–23; *Paluda*, 303 F. App'x at 308–09; *Jones*, 939 F.2d at 383. Thus, Count

II is completely preempted. In the alternative, Count II is within this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

**5. Count I (IWOWA Minimum Wage): retained under 28 U.S.C. § 1367.**

42. Defendants do not rest federal jurisdiction on Count I. Count I seeks the full Michigan minimum wage on the theory that Defendants lost the tipped-wage credit under Mich. Comp. Laws § 408.934d(1)(d)–(e). (Compl. ¶¶ 78–88.) Count I arises from the same 60/40 Allocation, the same payroll practices, the same 2025 and 2026 forms, and the same suite-bidding allegations as Counts II through V and is part of the same case or controversy under Article III. This Court therefore has supplemental jurisdiction over Count I under 28 U.S.C. § 1367(a). Defendants nevertheless expressly reserve the argument that Count I likewise requires interpretation of the CBA, which provides that "the minimum gratuity paid results in the server achieving the Federal Minimum Wage." (CBA, Schedule A.)

43. Because at least one of Plaintiffs' claims is completely preempted and arises under federal law, the entire action is removable. 28 U.S.C. §§ 1331, 1367(a), 1441(a).

F. ***Supplemental Jurisdiction Over Any Non-Preempted Claims***

44. This Court has supplemental jurisdiction over all claims "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a); *see City of Chicago v.*

*Int'l Coll. of Surgeons*, 522 U.S. 156, 164–66 (1997) (supplemental jurisdiction extends to state-law claims in a case removed on the basis of a federal claim). State and federal claims form part of the same case or controversy when they "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). And "if there is some basis for original jurisdiction, the default assumption is that the court will exercise supplemental jurisdiction over all related claims." *Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 892 (6th Cir. 1998).

45. All five counts derive from a single nucleus of operative fact: the 60/40 Allocation of suite gratuities between suite servers and suite runners, the payroll distribution of the runners' share, the 2025 Tip Pool Notification and the 2026 Tip Sharing Program forms, and the alleged conditioning of suite bidding on those forms. (Compl. ¶¶ 37–64.) The same witnesses, the same payroll and point-of-sale data, the same CBA provisions, and the same labor-relations history bear on every count. The preempted claims are not peripheral: Counts IV and V seek restitution of the very amounts sought in Counts II and III, and Count I rests on the same allocation.

46. None of the grounds in 28 U.S.C. § 1367(c) warrants declining jurisdiction while a claim within the Court's original jurisdiction remains. Judicial economy, convenience, fairness, and comity favor retaining the related claims. *See Gibbs*, 383 U.S. at 726.

## III. ALL PROPERLY JOINED AND SERVED DEFENDANTS CONSENT TO REMOVAL

47. Removal under 28 U.S.C. § 1441(a) on federal-question grounds requires that "all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(A); *Loftis v. United Parcel Serv., Inc.*, 342 F.3d 509, 516 (6th Cir. 2003). The rule of unanimity applies with equal force where the Court's jurisdiction over some claims rests on 28 U.S.C. § 1367. *Askew v. Metro. Prop. & Cas. Ins. Co.*, 217 F. Supp. 3d 982, 984–85 (E.D. Mich. 2016).

48. All Defendants who have been properly joined and served — Detroit Sportservice, DNC Sportservice, and Management Services— join in and consent to this removal. Undersigned counsel represents all three Defendants and signs this Notice on behalf of each.

49. Although counsel's representation of the other Defendants' consent may suffice, *see Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 201–02 (6th Cir. 2004), the separate written consents of DNC Sportservice and Management Services are attached as **Exhibit C** out of an abundance of caution.

## IV. VENUE AND INTRADISTRICT ASSIGNMENT

50. Venue is proper in this District and Division because the State Court Action is pending in the Circuit Court for the County of Wayne, Michigan, which

lies within the Southern Division of the Eastern District of Michigan. 28 U.S.C. §§ 102(a)(1), 1441(a), 1446(a).

## V. PROCEDURAL REQUIREMENTS AND RESERVATION OF DEFENSES

51. Under 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served upon Defendants in the State Court Action, including the Status Conference Scheduling Order entered by Judge McCarthy on October 28, 2026, are attached as **Exhibit A**.

52. Under 28 U.S.C. § 1446(d), promptly after filing this Notice, Defendants will give written notice of the removal to Plaintiffs' counsel and will file a copy of this Notice with the Clerk of the Circuit Court for the County of Wayne.

53. By removing this action, Defendants do not waive, and expressly preserve, all defenses, objections, and motions, including: all defenses under Fed. R. Civ. P. 12; the defense that Plaintiffs failed to exhaust the four-step grievance and arbitration procedure in Article 5 of the CBA, whose arbitral decision is "final and binding on Sportservice, the Union and the employees covered by this Agreement" (CBA, Art. 5 § 4); the right to compel arbitration; the federal seasonal amusement or recreational establishment exemption, 29 U.S.C. § 213(a)(3), as incorporated through Mich. Comp. Laws § 408.940; all defenses that one or more Defendants did not employ Plaintiffs; and all objections to class certification. Defendants do not concede that Plaintiffs have stated any claim or that any putative class member is

entitled to relief. Defendants reserve the right to amend or supplement this Notice to the extent permitted by 28 U.S.C. § 1653, including to cure defective allegations of jurisdictional facts that existed at the time of removal, *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 164–65 (6th Cir. 1993), and request the opportunity to submit additional evidence and briefing if Plaintiffs move to remand under 28 U.S.C. § 1447(c).

**WHEREFORE**, Defendant Detroit Sportservice, Inc., with the written consent of Defendants Delaware North Companies Sportservice, Inc. and Management Services, Inc., removes the State Court Action from the Circuit Court for the County of Wayne (Third Judicial Circuit), Business Court, to the United States District Court for the Eastern District of Michigan, Southern Division, and respectfully requests that this action proceed in this Court as an action properly removed.

Respectfully submitted,

JACKSON LEWIS P.C.

/s/ Allan S. Rubin
Allan S. Rubin (P44420)
Amira Genevieve Adel (P85646)
2000 Town Center, Suite 1650
Southfield, Michigan 48075
(248) 936-1900
allan.rubin@jacksonlewis.com
amiragenevieve.adel@jacksonlewis.com
Attorneys for Defendants Delaware North Companies Sportservice, Inc., Management Services, Inc., and Detroit Sportservice, Inc.

Dated: November 17, 2026

**CERTIFICATE OF SERVICE**

I certify that on November 17, 2026, I electronically filed the foregoing Notice of Removal, with its exhibits, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record who have appeared in this Court. I further certify that on the same date I served a copy by electronic mail and by first-class United States mail, postage prepaid, upon Plaintiffs' counsel of record, who have not yet appeared in this Court: David M. Blanchard (P67190) and Cali N. Winslow (P88487), Blanchard & Walker PLLC, 221 N. Main Street, Suite 300, Ann Arbor, Michigan 48104, blanchard@bwlawonline.com and winslow@bwlawonline.com.

/s/ Allan S. Rubin
Allan S. Rubin (P44420)